**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**August 5, 2022**

**Christopher M. Wolpert**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

ORLANDO CORTEZ-NIETO,

    Defendant - Appellant.

_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

JESUS CERVANTES-AGUILAR,

    Defendant - Appellant.

No. 20-3184

No. 20-3189

_____

**Appeal from the United States District Court**
**for the District of Kansas**
**(D.C. Nos. 2:18-CR-20030-JAR-1 & 2:18-CR-20030-JAR-2)**
_____

Paige Nichols, Assistant Federal Public Defender (Melody Brannon, Federal Public Defender, with her on the briefs), Office of the Federal Public Defender, District of Kansas, for Defendant - Appellant Orlando Cortez-Nieto.

Candace Caruthers, Assistant Federal Public Defender (Virginia L. Grady, Federal Public Defender, and Shira Kieval, Assistant Federal Public Defender, on the briefs), Office of the Federal Public Defender, Districts of Colorado and Wyoming, for Defendant - Appellant Jesus Cervantes-Aguilar.

James A. Brown, Assistant United States Attorney (Duston J. Slinkard, Acting United States Attorney, and Emma J. Staats, Legal Intern, with him on the brief), Office of the United States Attorney, District of Kansas, for Plaintiff - Appellee.

_____

Before **HARTZ**, **HOLMES**, and **BACHARACH**, Circuit Judges.

_____

**HARTZ**, Circuit Judge.

_____

Defendants Orlando Cortez-Nieto and Jesus Cervantes-Aguilar were convicted by a jury of four methamphetamine offenses committed within 1,000 feet of a playground. After their convictions Defendants filed motions for judgment of acquittal. The district court granted the motions in part, setting aside the convictions on the ground that there was insufficient evidence that any of the offenses of conviction occurred within 1,000 feet of a playground but entering judgments of conviction on lesser-included offenses—the four offenses without the proximity element.

In their consolidated appeal, Defendants raise three issues. First, they claim (a) that a jury instruction stating that the jury should not consider the guilt of any persons other than Defendants improperly precluded the jury from considering that two government witnesses were motivated to lie about Defendants to reduce or eliminate their own guilt and (b) that the prosecutor improperly magnified this error by explicitly arguing that the jurors could not consider the witnesses' guilt in assessing their credibility. We reject this claim because the instructions, taken as a whole, were unlikely to mislead the jury and the prosecutor's argument likely

2

reduced the possibility of misunderstanding the instructions. Second, Defendants contend that the district court should not have imposed judgments of conviction on the lesser-included offenses after determining that the original charges had not been proved because the jury had not been instructed on the lesser-included offenses. We hold that the district court simply performed its duty, and Defendants were not prejudiced by the absence of lesser-included-offense instructions. Third, Defendants assert that remand is necessary to correct a clerical error in the judgment forms. The government concedes the point, and we agree. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm the district-court judgments except that we remand for correction of the clerical error.

## I.    BACKGROUND

On December 1, 2017, a fire broke out at a residence on Cleveland Avenue in Kansas City, Kansas. Firefighters and a search-and-rescue crew responded to the scene, but when they arrived the fire was already extinguished, and it had caused little to no damage to the residence. No one was in the house. The house was within walking distance of Klamm Park, which has a baseball field, tennis courts, and playgrounds.

Investigators looking for the cause of the fire discovered inside the residence some $200,000 worth of methamphetamine and various items used in methamphetamine manufacturing, including empty cans of acetone, heating devices, thermometers, pails, pots, and coolers. The investigators suspected that an apparatus

3

set up in the residence's basement was a clandestine methamphetamine lab designed to convert liquid methamphetamine to its crystalline form.

Further search of the residence turned up several receipts (dated less than 10 days before the fire) for goods purchased from general-merchandise, hardware, and automotive stores in Kansas City. Among other things, the receipts listed boxes, coolers, thermometers, pails, and spray bottles. And, most notably, 11 receipts reflected the purchase of acetone, sometimes in quantities as large as a gallon (the function of acetone in producing marketable methamphetamine was not disputed at trial). Law-enforcement officers obtained video-surveillance footage from the stores named on the receipts, which showed Defendants purchasing the items on the receipts.

Defendants were arrested and indicted on four counts: (1) conspiracy to manufacture over 50 grams of methamphetamine within 1,000 feet of real property comprising a playground; (2) manufacturing and attempting to manufacture 50 grams or more of methamphetamine within 1,000 feet of a playground; (3) possession with intent to distribute 50 grams or more of methamphetamine within 1,000 feet of a playground; and (4) opening, using, and maintaining a residence for the purpose of manufacturing methamphetamine within 1,000 feet of a playground. *See* 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(viii), 846, 856(a)(1), 860(a).

Defendants did not challenge at trial, and have conceded on appeal, that they bought the materials listed on the receipts found at the Cleveland Avenue residence. But they have argued that they had no knowledge of the methamphetamine lab and

4

only purchased those materials at the request of others. The issue of knowledge was the focus of the trial.

To tie Defendants to the Cleveland Avenue residence, the government offered a fair amount of nontestimonial evidence. A FedEx parcel shipped on November 22 and addressed to Mr. Cortez-Nieto at the residence was found in the house, as was a sticky note on which was written the name "Orlando" and a phone number for which Mr. Cortez-Nieto was the named subscriber. In addition, police found within the home a camouflage-style coat that matched the coat worn by Mr. Cortez-Nieto on the videos of his store purchases. As for Mr. Cervantes-Aguilar, officers found a receipt for sending a money transfer on November 24 that bore his name and the Cleveland Avenue address. They also found a "ledger" (a blue spiral book of index cards on which were recorded apparent financial transactions), which testimony (as explained below) tied to Mr. Cervantes-Aguilar. And investigators obtained a Kansas certificate of title dated November 13 showing that someone acting with a power of attorney for Mr. Cervantes-Aguilar purchased a Honda on November 12 and listed Mr. Cervantes-Aguilar's address as the Cleveland Avenue residence. (Mr. Cervantes-Aguilar changed the address on the title a few days after the fire.)

Two siblings connected to the house, Celia Suarez and Victor Suarez, were witnesses for the prosecution. Celia had rented the Cleveland Avenue house a few weeks before the fire. She testified under an agreement with the government to provide complete and truthful information; in return, the government promised that her statements would not be used against her in any federal prosecution. Celia told

the jury that she had rented the house on behalf of a Mexican drug dealer named Jose Pantoja for use by a "Jesus Estrella," the name by which she knew Mr. Cervantes-Aguilar. When she met with the landlord for the Cleveland Avenue property to look at the residence, she was accompanied by her brother Jaime (not Victor) and Mr. Cervantes-Aguilar. (At trial the landlord identified Mr. Cervantes-Aguilar as having accompanied Celia to the meeting.) She said that she had been romantically involved with Mr. Pantoja until the day of the fire. At the same time, however, she had also briefly dated Mr. Cervantes-Aguilar and planned to move into the Cleveland Avenue residence with him until he broke things off upon learning that Celia had children. Celia denied knowing that the house she rented would be used for drugs and denied any involvement in the drug operations there. She said she first learned the house was being used for methamphetamine manufacturing on the day of the fire, when Mr. Cervantes-Aguilar called her to report the fire and referred to the house as a "chingadera," which she understood to mean that the house contained drugs. R., Vol. II at 513–14. Despite her professed lack of knowledge about what was happening in the Cleveland Avenue residence, she testified that Mr. Cervantes-Aguilar was in charge of the methamphetamine lab at the house and that he was working for another Mexican trafficker named Jesus Mendoza—the cousin of Mr. Pantoja and apparently a superior of Mr. Pantoja. Celia testified that she had never interacted much with Mr. Cortez-Nieto and knew him only as "Pacha." She had seen him just twice—once at a horse race and once outside the Cleveland Avenue residence.

Telephone records confirmed that Celia received a phone call less than a half hour after the fire started. The phone number was linked to a prepaid phone, so no subscriber information was available; but the number was in Celia's phone-contact list and she told investigators that the number belonged to Mr. Cervantes-Aguilar. Of the 210 cell-tower connections made by that phone from November 20 (when the phone was activated) to December 1 (after which the phone was not used), 100 were to cell towers near the Cleveland Avenue residence, indicating that the user was not far from the residence.

Victor also testified under an agreement with the government. He had been indicted on federal drug and firearms charges arising out of his involvement with a methamphetamine lab in Kansas City, Missouri. Under his agreement his testimony would not be used against him in his Missouri case and it might result in a lower sentence. Victor testified that he worked for Mr. Mendoza, who managed two separate groups producing and distributing methamphetamine, one in Missouri and one in Kansas. Victor was one of the men leading the Missouri operation. He identified "Jesus" (Mr. Cervantes-Aguilar) and "Pacha" (Mr. Cortez-Nieto) as the leaders of Mr. Mendoza's Kansas operation, with Mr. Cortez-Nieto manufacturing methamphetamine and Mr. Cervantes-Aguilar distributing it. Victor said that on several occasions when he owed money to Mr. Mendoza, he was instructed to give the money to Mr. Cervantes-Aguilar. According to Victor, various entries in the ledger found at the Cleveland Avenue residence reflected those transactions. For example, the entry "Chongo medio $500 hotel" was stating that "Chongo [which

7

Victor said was his own nickname] gave me $500 [at a] hotel" ("me dio" is Spanish for "gave me"). R., Vol. II at 656–57. Although Victor did not recognize the handwriting in the ledger or see Mr. Cervantes-Aguilar make entries in it, he inferred that the entries were made by Mr. Cervantes-Aguilar because he was the one Victor dealt with. The inference is also supported by the absence of Mr. Cervantes-Aguilar's name or nickname in the ledger.

Victor and Celia were not the most credible witnesses to ever testify in federal court. As the prosecutor recognized in her rebuttal closing argument, "If I got to pick witnesses, . . . I'd pick my mom, my minister." *Id.* at 1196. Celia did not explain how she knew that Mr. Cervantes-Aguilar was in charge of the methamphetamine operation on Cleveland Avenue and was working for Mr. Mendoza despite her professed ignorance about there being a methamphetamine laboratory there. Also, before her testimony at trial she had given several different versions of who was with her when she met the landlord, when and with whom she was having affairs, and who asked her to rent the residence. Victor denied any involvement with the operation on Cleveland Avenue even though his name was on the gas account for the address. A jury might well have doubted his explanation that his sister asked him to open the account in his name because she already owed money to the gas company. And the jury might not have believed that the ledger entries for money coming from him reflected merely his repayment of debts to Mr. Mendoza.

The major thrust of the attacks on Celia and Victor by defense counsel, however, focused on their motives to lie to escape the consequences of their own

8

criminal activity. Counsel suggested that the true culprits—those who were really running the methamphetamine lab on Cleveland Avenue—were Victor and Celia. Defendants had merely been enlisted to purchase supplies, they argued, and they had no idea what the supplies would be used for. In closing argument, counsel for Mr. Cervantes-Aguilar said, "Celia Suarez, if she didn't have any problems with innocence or guilt, then why does she need a letter from the government to protect her on what she's saying and a lawyer to help her get it?" *Id.* at 1189–90. And on cross-examination, Victor, who had acknowledged that he hoped his testimony in this trial would help reduce his sentence in the Missouri case, agreed with defense counsel that "people that are charged with drug crimes will lie and say anything to try to reduce their sentence," *id.* at 683, although he explained his own testimony otherwise, saying, "I am here because I don't want another person to stain my name about something that I did not do." *Id.*

The jury convicted Defendants as charged. After the verdict, however, Defendants, who had not previously challenged the distance of the laboratory from Klamm Park, moved for judgments of acquittal. The district court agreed that there was not sufficient evidence to prove beyond a reasonable doubt that the drug offenses occurred within 1,000 feet of Klamm Park. But the district court held that the government had presented sufficient evidence to support the lesser-included offenses of the charged crimes—that is, the four charged crimes without the proximity element—and therefore entered against each Defendant judgments of conviction on those four lesser-included offenses.

## II.   DISCUSSION

On appeal Defendants argue (1) that an improper jury instruction, exacerbated by the prosecutor's improper closing argument, foreclosed consideration by the jury of their chief defense theory, (2) that the district court erred in entering judgments of conviction on lesser-included offenses after determining that there was insufficient evidence of an element of the charged offenses, and (3) that the district court misstated the offenses of conviction in the judgments of conviction. We begin with the jury instruction.

### A.   Jury instructions and alleged prosecutorial misconduct

We review jury instructions de novo to determine whether they, as a whole, correctly state the governing law, but we review for abuse of discretion the district court's decisions regarding such matters as the framing, articulation, and detail of the instructions. *See United States v. Jean-Pierre*, 1 F.4th 836, 846 (10th Cir. 2021) ("This court reviews the jury instructions de novo in the context of the entire trial to determine if they accurately state the governing law and provide the jury with an accurate understanding of the relevant legal standards and factual issues in the case. In doing so, we consider whether the district court abused its discretion in shaping or phrasing a particular jury instruction and deciding to give or refuse a particular instruction." (citation, brackets, and internal quotation marks omitted)).

Defendants focus their challenge on the last sentence of the following jury instruction:

10

INSTRUCTION NO. 24

You are here to decide whether the government has proved beyond a reasonable doubt that each defendant is guilty of the crimes charged. The defendants are not on trial for any act, conduct, or crime not charged in the Superseding Indictment.

It is not up to you to decide whether anyone who is not on trial in this case should be prosecuted for the crime charged. The fact that another person also may be guilty is no defense to a criminal charge.

*The question of the possible guilt of others should not enter your thinking as you decide whether these defendants have been proved guilty of the crimes charged.*

R., Vol. I at 343 (emphasis added). The challenged sentence conveys an important, and quite proper, message. The jury should not be more lenient toward the accused just because others who have committed the same or similar offenses have gone free; nor should the jury be more inclined to convict the accused because of the guilt of others. *See Osborne v. United States*, 371 F.2d 913, 923–24 (9th Cir. 1967) (guilt-of-others instruction properly conveyed that "appellant stood alone as a defendant, and that his acts only were to be judged"); *United States v. Oberle*, 136 F.3d 1414, 1423 (10th Cir. 1998) (similar instruction "focused jurors on the task at hand: determining whether [defendant] was guilty of the [charged offense]"). But Defendants suggest that the sentence could also have an improper effect. As we understand their argument, their complaint is that if the guilt of Celia and Victor was not to enter the minds of the jurors, then the jurors could not consider the possibility that the two witnesses were lying to cover up or mitigate their own guilt.

There is enough force to this argument for us to recommend modifying the language of the instruction in similar future cases. But that force is greatly

diminished in this case by the other instructions given to the jury, as well as the closing arguments of counsel.

At least three other instructions unambiguously impressed upon the jury its duty to examine the Suarezes' motives for their testimony. Instruction No. 4 addressed the beyond-a-reasonable-doubt standard and instructed the jurors generally on their duty to evaluate witness credibility:

### INSTRUCTION NO. 4

I remind you that it is your job to decide whether the government has proved the guilt of each defendant beyond a reasonable doubt. In doing so, *you must consider all of the evidence. This does not mean, however, that you must accept all of the evidence as true or accurate.*

You are the sole judges of the credibility or "believability" of each witness and the weight to be given to the witness's testimony. . . . In making that decision, I suggest that you ask yourself a few questions: Did the witness impress you as honest? *Did the witness have any particular reason not to tell the truth? Did the witness have a personal interest in the outcome in this case? Did the witness have any relationship with either the government or the defense?* Did the witness seem to have a good memory? Did the witness clearly see or hear the things about which he/she testified? Did the witness have the opportunity and ability to understand the questions clearly and answer them directly? Did the witness's testimony differ from the testimony of other witnesses? When weighing the conflicting testimony, you should consider whether the discrepancy has to do with a material fact or with an unimportant detail. And you should keep in mind that innocent misrecollection—like failure of recollection—is not uncommon.

R., Vol. I at 318 (emphasis added).

Instruction No. 6 emphasized the credibility concerns specific to witnesses like accomplices and informants who may have a special interest in the outcome of a case:

12

INSTRUCTION NO. 6

**Accomplice**

An accomplice is someone who joined with another person in committing a crime, voluntarily and with common intent. The testimony of an accomplice may be received in evidence and considered by you, even though it is not supported by other evidence. You may decide how much weight it should have.

You are to keep in mind, however, *that accomplice testimony should be received with caution and considered with great care. You should not convict a defendant based on the unsupported testimony of an alleged accomplice, unless you believe the unsupported testimony beyond a reasonable doubt.*

**Informant**

An informant is someone who provides evidence against someone else for a personal reason or advantage. The testimony of an informant alone, if believed by the jury, may be of sufficient weight to sustain a verdict of guilt, even though not corroborated or supported by other evidence. *You must examine and weigh an informant's testimony with greater care than the testimony of an ordinary witness. You must determine whether the informant's testimony has been affected by self-interest, by an agreement he has with the government, by his own interest in the outcome of the case, or by prejudice against the defendant.*

You should not convict a defendant based on the unsupported testimony of an informant, unless you believe the unsupported testimony beyond a reasonable doubt.

R., Vol. I at 321 (emphasis added).[1]

---

[1] Counsel for Mr. Cortez-Nieto recognized the importance of Instruction No. 6 to the jury's task of evaluating the Suarezes' credibility. In her closing argument, she specifically invoked this instruction, saying that the jurors would "see very quickly that Celia and Victor fit into either one of these categories [accomplice or informant]," and admonishing the jurors to "proceed with caution," "exercise great care," and "slow down, pause, and question" the Suarezes' testimony "very carefully." R., Vol. II at 1175.

And Instruction No. 7 reiterated that accomplice testimony presented by the government required the jury's particular attention:

### INSTRUCTION NO. 7

The government called as one of its witnesses an alleged accomplice, who was charged in another case.

An alleged accomplice, including one who has pending charges, is not prohibited from testifying. On the contrary, the testimony of an alleged accomplice may, by itself, support a guilty verdict. *You should receive this type of testimony with caution and weigh it with great care. You should never convict a defendant upon the unsupported testimony of an alleged accomplice, unless you believe that testimony beyond a reasonable doubt.*

R., Vol. I at 322 (emphasis added).

Our precedents support the use of Instruction No. 24. This court has upheld identical or similar language in at least three previous cases. In *Oberle* a robbery defendant complained that an instruction telling jurors "not to concern themselves with the guilt of anyone except Oberle" foreclosed the jury's consideration of his defense that his brother was the real perpetrator. 136 F.3d at 1422. We rejected the challenge, observing that the instruction, in combination with the standard beyond-a-reasonable-doubt instruction, correctly "focused jurors on the task at hand: determining whether Oberle was guilty of the . . . robbery." *Id.* at 1423. In *United States v. Arras*, 373 F.3d 1071, 1076 (10th Cir. 2004), the instruction at issue stated: "You are here to decide whether the government has proven beyond a reasonable doubt that each defendant is guilty of the crimes charged. And you must not be concerned with the guilt or innocence of other persons not on trial as a defendant in this case." The defendants' trial strategy had been to show that a government

cooperating witness named Nielsen had been "lying to cover for" other individuals involved in the charged drug-dealing conspiracies. *Id.* The defendants argued that the guilt-of-others instruction foreclosed their defense theory because "the guilt of these external parties was relevant to [Nielsen's] credibility." *Id.* We rejected the challenge, first by holding that the argument was foreclosed by *Oberle*, and second by observing that the jury was given "specific instructions . . . admonishing them to weigh . . . Nielsen's credibility with considerable caution because she was a drug user, an accomplice, and a criminal defendant who was testifying as part of a plea agreement." *Id.* at 1077. The guilt-of-others instruction was again at issue in *United States v. Little*, 829 F.3d 1177, 1186 (10th Cir. 2016), in which the defendant attacked an instruction that read: "[T]he question of the possible guilt of others should not enter your thinking as you decide whether this defendant has been proved guilty of the crime charged." Little argued that the instruction undermined his chief defense at trial—that someone else was responsible for the charged firearms offense. *Id.* We held that "[t]he district court properly instructed the jury that involvement by third parties would not constitute an absolute defense" and that *Oberle* precluded Little's argument. *Id.*

We are not persuaded by Defendants' attempts to distinguish *Oberle* and *Arras*. There are minor differences in the language of the instructions challenged in those cases and the language of Instruction No. 24; but substantively they are identical. Nor are we persuaded by Defendants' attempts to distinguish *Little*. They argue that although the instruction in *Little* was identical to the one challenged here,

15

Little's defense that "someone else committed the crime," 829 F.3d at 1186, was not quite the same as Defendants' defense here that key witnesses were not credible because of their own guilt. But the defendants' trial strategy in *Arras* was essentially the same as that of Defendants here—arguing that a cooperating witness was "lying to cover for" other guilty individuals and therefore was not credible. 373 F.3d at 1076.

Instructions 4, 6, and 7 told the jury to carefully consider the Suarezes' motives to lie and to credit their unsupported testimony only if credible beyond a reasonable doubt. Under our precedents, that sufficed to protect Defendants' efforts to impeach the Suarezes' credibility.

We do, however, add one qualification to this conclusion. We might take a different view of the challenged sentence from Instruction No. 24 if it had been improperly used, without correction from the district court, in closing argument. But we see no improper use by the prosecutor in this case. Defendants allege that the prosecutor engaged in misconduct in closing argument by telling the jury that it could not consider the Suarezes' motive to lie to conceal their own guilt in the offenses charged. *See* Cervantes-Aguilar Br. at 39 (prosecutor "not only emphasized the district court's instructional error, but it also explicitly used that misstatement to improperly negate a legitimate defense theory"); Cortez-Nieto Br. at 27 ("The prosecutor misstated the law when she told the jurors that the defendants' challenge to the Suarezes' credibility was foreclosed by Instruction 24."). They focus on two sentences from the prosecutor's rebuttal closing argument: "Instruction No. 24 tells

16

you what to do with this kind of argument. It tells you that the possible guilt of other people should not enter into your thinking as you decide whether or not these two defendants are guilty of the crimes that are charged in this indictment." R., Vol. II at 1196. In identical language they both assert that the "prosecutor argued during rebuttal that the jurors should not consider [their] challenge to the Suarezes' credibility to the extent that that challenge was based on their possible guilt." Cervantes-Aguilar Br. at 35; Cortez-Nieto Br. at 26.

This assertion, however, ignores context. The prosecutor's rebuttal argument began as follows:

> Let's start by talking about Victor and Celia. I didn't pick them as witnesses. If I got to pick witnesses, . . . I'd pick my mom, my minister. You know who picked them as witnesses? These two because they got in bed with Victor and Celia to run this methamphetamine lab.
>
> *Instruction No. 24 tells you what to do with this kind of argument.* It tells you that the possible guilt of other people should not enter into your thinking as you decide whether or not these two defendants are guilty of the crimes that are charged in this indictment.
>
> And it reminds me of when you get stopped for speeding, and you get stopped for speeding and you are speeding. But there are people who are flying by you, going faster than you. When you get pulled over, you're like, yeah, I was speeding, but those people were speeding faster; why didn't you get them . . . instead? It's the same argument. It doesn't make you less guilty.
>
> And Celia and Victor they don't have to be innocent for you to find these two defendants guilty.
>
> But what we do . . . when we have people who are accomplices or informants is we try to corroborate them.

R., Vol. II at 1196–97 (emphasis added).

17

We think it clear that the lesson the prosecutor was drawing from Instruction No. 24 was that the jury should not concern itself with whether accomplices were going free. The fact that the Suarezes may have been escaping punishment for their crimes did not lessen Defendants' culpability. Defendants argue that there was no need to make this point because they did not suggest to the jury that it should grant a jury pardon on the ground that those who were equally, or even more, culpable were escaping punishment. We take the point. Defendants did not make that argument; we have not been directed to anything improper in the closing arguments for the defense. But that does not mean that the jury, particularly after hearing defense closing arguments (such as the arguments in this case) that paint the government witnesses as the real culprits, would not entertain the thought that it would be unfair in the circumstances to convict the defendants. The prosecution has every right to try to forestall such action by the jury.

Further, the prosecutor did not argue, or insinuate, that the criminality of the Suarezes should not diminish their credibility; nor did she object to the defense arguments that the Suarezes should not be believed because of their motive to escape punishment for their own crimes. She never suggested that they were not guilty of drug trafficking. On the contrary, she began the rebuttal closing by saying that Defendants were being tried "because they got in bed with Victor and Celia to run

18

this methamphetamine lab." *Id.* at 1196.[2] And she conceded that because the Suarezes

were accomplices (that is, were themselves criminals), their testimony was suspect.

In addition, after discussing the evidence corroborating the government's case,

the prosecutor repeated the same two points—(1) that accomplice testimony is

suspect and (2) that the guilt of Victor and Celia would not free Defendants of

criminal responsibility:

> The instruction regarding the informants and the accomplices, if you
> believe them, if they're corroborated and if you believe them beyond a
> reasonable doubt, absolutely it's within your right to give their testimony
> that weight.
>
> The phone records corroborate the testimony of those two people. This
> ledger corroborates the testimony of those two people. And even if Victor
> and Celia are involved in this, even if they're the two main bank robbers in
> my analogy, that doesn't mean that these two aren't involved.

R., Vol. II at 1199–1200. We fail to see any impropriety, much less reversible error,

in the prosecutor's closing argument.

---

[2] In the same vein, the prosecutor had ended the government's case with the
following exchange with DEA agent Jennifer Waller on redirect examination:

> Q. Now, with regard to the role of both Victor and Celia Suarez in this
> case, it's entirely possible that the both of them are unindicted co-
> conspirators?
> A. Correct.
> Q. We don't have the evidence to charge them with that, correct?
> A. Correct.
> Q. But obviously they had some role in helping the two defendants in
> this case?
> A. Yes.
> Q. And at the very least, perhaps aided and abetted?
> A. Correct.

R., Vol. II at 1035.

B.    **Lesser-included offenses**

Each of the offenses for which Defendants were initially convicted requires proof that the drug-trafficking activity occurred "within one thousand feet of . . . real property comprising . . . a playground." 21 U.S.C. § 860(a). Cleveland Avenue runs into Klamm Park. It has not been disputed that the park satisfied the playground requirement. To establish the distance from the Cleveland Avenue residence to the park, a law-enforcement agent holding a rolling measuring tape walked west from a sign a few feet inside the park down Cleveland Avenue to the driveway on the east side of the residence. He measured 942 feet. A Google Maps printout depicting an aerial view of the park and the residence was admitted into evidence. The map gave a distance of 602 feet. The government explicitly disclaimed any reliance on the map for the purpose of proving distance, but the agent testified that the difference in the distances measured by Google and by the agent could be accounted for by a hill the agent had to walk up while going from the park to the house's driveway.

Defendants raised no challenge to the measurement during trial. Indeed, the prosecutor thought the measurement was uncontested, telling the jury during closing argument: "[T]he fact that 2739 Cleveland Avenue is within 1,000 feet of Klamm Park is not in dispute. So you can just check that off the list of things you need to look at." R., Vol. II at 1160. Nor did Defendants raise a challenge to the distance in any preverdict motion.

The first mention of any problem with the distance was in renewed motions for judgment of acquittal timely filed by Defendants 45 days after the jury's verdict.

They argued that the distance must be measured from the park to the lab itself, not just to the property line for the residence, and that the evidence failed to show that the lab was less than 58 feet from the street (1,000 feet minus the 942 feet measured by the agent), so the lab's total distance from the park could have been more than 1,000 feet. The government responded that photos of the house, driveway, and doorway into the house bridged any gap in the measurement evidence. And it argued that since hilly terrain inflated the 942-foot walking measurement far beyond a measurement made as the crow flies, a jury could reasonably infer that the missing distance from the street to the lab would not bring the straight-line distance between Klamm Park and the lab above 1,000 feet.

The district court agreed with Defendants. Although it did not question what it termed a "broad consensus" that the "distance is properly measured in a straight-line or 'as the crow flies,'" R., Vol. I at 398, it noted that the government had explicitly disclaimed reliance on the Google Maps-measured distance of 602 feet and was bound by the measurement it offered of 942 feet from the park to the residence's east-side property line. (The court did, however, subtract 10 feet from the measurement to account for the agent's testimony that the measurement began about 10 feet within the park, resulting in a distance of 932 feet.) It then concluded that the evidence offered by the government (in particular, pictures of the residence that did not show the end of the driveway) was insufficient for a jury to find beyond a reasonable doubt that the distance from the property line to the laboratory was less

than 68 feet (1,000 feet less 932 feet).[3] But because there was sufficient evidence of

the other challenged elements, the district court did not grant Defendants the full

---

[3] (The views expressed in this footnote are those solely of the author of the opinion.) The district court may well have denied the motions for judgment of acquittal if the government had invoked one of the fundamental lessons of high-school geometry. Because the government has not cross-appealed the judgment of acquittal, we have no power to reverse that holding. *See Greenlaw v. United States*, 554 U.S. 237, 244–45 (2008) ("This Court, from its earliest years, has recognized that it takes a cross-appeal to justify a remedy in favor of an appellee."). But it may be useful to point out the error should the issue recur in a future case.

The district court acknowledged that the jury could in some circumstances use "common sense, common knowledge, and rough indices of distance" to determine whether the 1,000-foot requirement was satisfied when "the government does not offer a measurement to the location of the drug activity within the building but instead offers some other measurement (such as one to the property line for the entrance of the building)." R., Vol. I at 399 (internal quotation marks omitted). Whether the common-sense approach would be appropriate depended on whether the spatial leeway (the distance that the jury would have to estimate) was modest. If it was modest, actual measurement would be necessary. The court said that distances less than 100 feet have been treated by the courts as modest, so actual measurements would be needed in this case because the measured distance along Cleveland Avenue was 932 feet, "leav[ing] a spatial leeway of 68 feet." *Id.*

The spatial leeway, however, was much greater than 68 feet. The parties and the district court appeared to assume that the distance from the park to the laboratory was the sum of the distance from the park to the property line along Cleveland Avenue plus the distance from Cleveland Avenue to the laboratory. That is incorrect. The straight-line distance (the distance as the crow flies, which the district court took to be the proper measurement) between the lab and the park can be thought of as the hypotenuse of a right triangle—as illustrated below—with the measured distance along Cleveland Avenue (which, as shown by an aerial view of Cleveland Avenue introduced into evidence, is a straight line) forming one of the legs and the unmeasured distance from the lab to the street forming the other leg.



When, as here, one leg of a right triangle is much longer than the other, the hypotenuse is barely longer than the long leg. For the straight-line distance between

relief they sought—dismissal of all charges. It decided that it should not go so far and

instead entered judgment on the lesser-included offenses—that is, the four charged

crimes absent the playground-proximity element of 21 U.S.C. § 860(a). On appeal

Defendants challenge only the district court's decision not to fully acquit them once

---

the lab and the park to exceed the 1,000-foot maximum, the Pythagorean theorem ($a^2 + b^2 = c^2$, here $a^2 + 932^2 = 1000^2$) shows that the distance from the lab to the street would need to be more than approximately 362 feet—longer than a football field. It would have been perfectly reasonable for the jury to use its common sense to conclude that the lab was less than 1,000 feet from the park. (Adjusting for the fact that the drug activity was not conducted on the home's east-side property line makes little difference. Photographs of the home show how small it was. In particular, a photograph from the outside, which shows several people so that one can get a reasonable scale of distance, depicts a small garage near the east-side property line. Testimony placed methamphetamine in the kitchen adjacent to the garage. Even if the kitchen was 40 feet from the property line, so that the long side of the right triangle would be 972 feet, the kitchen would be less than 1,000 feet from the park so long as it was less than 234 feet from the street.) Of course, other considerations may come into play that would justify the district court's ultimate determination. But that determination should be based on sound mathematics.

　　　　Just one final observation. It appears to me that the decision in *United States v. Soler*, 275 F.3d 146, 154–55 (1st Cir. 2002), is one that may well have come out the other way if the government had brought the Pythagorean theorem to the attention of the court. The question was whether a heroin sale on the third-floor landing of an apartment building took place within 1000 feet of a school building. *See id.* at 154. The court said it was to use a "straight-line rather than pedestrian-route measurement[]." *Id.* at 155 n.6. The court accepted that the distance from the school to the rear entrance of the apartment building was 963 feet. *See id.* at 154. "But," according to the court, "this left an obvious gap—the distance between the base of the [apartment] building and the third-floor landing on which the heroin was sold—and the government offered no direct evidence as to that distance." *Id.* The court said that the "spatial leeway" was only 37 feet, *id.*, and reasonably determined that the jury could not have accurately determined that distance from a video (which included glimpses of the relevant portion of the building) shown at trial, *see id.* at 155. The Pythagorean theorem, however, would have shown that the straight-line distance from the school to the third-floor landing would have been less than 1,000 feet so long as the landing was less than 269 feet above the base of the apartment building, and the jury could certainly have used its common sense to make that finding.

23

it concluded that there was insufficient evidence of the playground-proximity element. We reject the challenge.

The district court did only what we have stated it should do on a motion to set aside a verdict for insufficient evidence. In *United States v. Wood*, 207 F.3d 1222 (10th Cir. 2000), we gave the following directive: "When ruling on a motion for judgment of acquittal, a district court should consider not only whether the evidence would be sufficient to sustain a conviction of the offense charged, but also whether it would be sufficient to sustain a conviction on a lesser included offense," *id.* at 1229; *see Gov't of Virgin Islands v. Josiah*, 641 F.2d 1103, 1108 (3d Cir. 1981) ("A jury's finding of guilt on all elements of the greater offense is necessarily a finding of guilt on all elements of the lesser offense, since a lesser-included offense consists of some of the elements of the greater offense and does not require the proof of any element not present in the greater offense. . . . A trial court therefore has authority to enter a judgment of conviction on a lesser-included offense when it finds that an element exclusive to the greater offense is not supported by evidence sufficient to sustain the jury's finding of guilt on the greater offense.").

When we determine on appeal that there is insufficient evidence to support the verdict, we consider what we call the *Allison* factors in deciding whether to order entry of judgment on a lesser-included offense:

> "It must be clear (1) that the evidence adduced at trial fails to support one or more elements of the crime of which appellant was convicted, (2) that such evidence sufficiently sustains all the elements of another offense, (3) that the latter is a lesser included offense of the former, and (4) that no undue prejudice will result to the accused."

*United States v. Smith*, 13 F.3d 380, 383 (10th Cir. 1993) (quoting *Allison v. United States*, 409 F.2d 445, 451 (D.C. Cir. 1969)). In doing so we exercise the authority of appellate courts under 28 U.S.C. § 2106 to modify erroneous judgments. (The statute was necessary to overcome "English common law rules restricting [appellate-court] authority." *Austin v. United States*, 382 F.2d 129, 140 (D.C. Cir. 1967).) Although we apparently have never explicitly instructed district courts to do so, we see no reason why a district court should not apply the same factors when it confronts the same issue. *See United States v. Herron*, 757 F. Supp. 2d 525, 532 (E.D. Pa. 2010) (applying *Allison* factors); *United States v. Guerra-Javalera*, No. CRIMA03-20054-02KHV, 2006 WL 3772315, at *4 (D. Kan. Dec. 20, 2006) (same). If anything, given its greater familiarity with the record and proceedings, a district court is in a better position than an appellate court to assess these factors in the first instance. *Cf. Austin*, 382 F.2d at 143 (stating, when remanding to district court to determine whether remedy should be new trial or entry of conviction of lesser-included offense after appellate court rules that there was insufficient evidence of greater offense, "It is our view . . . that optimum application of Section 2106 bids an appellate court take into account that its remoteness may not provide as good a vantage point as the trial court's proximity for detecting possibilities of prejudice in a particular case.").

The district court chose to apply the *Allison* factors and did so properly. We need not address whether our standard of review is de novo, abuse of discretion, or otherwise, because the conclusion would be the same regardless. The only possible dispute is over the fourth factor of undue prejudice. But we see no undue prejudice

25

here. Defendants give us no reason to believe, and we see none, that they omitted any evidence, argument, tactic, or strategy that they would have employed had the trial been limited to the lesser-included offenses. *See, e.g.*, *Smith*, 13 F.3d at 383 ("Mr. Smith has not offered the slightest suggestion of how the defense might have differed."); *Allison*, 409 F.2d at 451 ("There is no indication that defense presentation would have been altered had the [greater-offense] charge been dismissed at the close of the Government's case."); *Austin*, 382 F.2d at 143 ("We do not see how defense presentation might have been altered if the [greater-offense] charge had been dropped at the close of the Government's evidence."). We reiterate that Defendants' trial strategy had nothing to do with the proximity element, which was not disputed until after the verdict.

Defendants do not contest the district court's application of the *Allison* factors but instead contend that the district court should have never considered the issue of lesser-included offenses in the first place. They argue that it was inappropriate for the court to enter judgment on lesser-included offenses when the prosecution had not sought a jury instruction on lesser-included offenses. Some circuits have agreed with that proposition, either in a holding, *see United States v. Dhinsa*, 243 F.3d 635, 675–76 (2d Cir. 2001); *United States v. Melton*, 491 F.2d 45, 49 (D.C. Cir. 1973), or dictum, *see United States v. Dinkane*, 17 F.3d 1192, 1198 (9th Cir. 1994). But other circuits have said that a lesser-included-offense instruction is not a prerequisite to imposing a conviction on a lesser-included offense. *See United States v. Sepulveda-Hernandez*, 752 F.3d 22, 30 n.3 (1st Cir. 2014) (remanding for entry of judgment on

26

lesser-included offense and noting that presence or absence of lesser-included-offense instruction was irrelevant to court's prejudice analysis under *Allison*); *United States v. Petersen*, 622 F.3d 196, 205–07 (3d Cir. 2010) (affirming district court's entry of judgment on lesser-included offense after jury returned an elements-based special verdict form on which only the elements of the lesser-included offense were marked as proved, despite defendant's argument that jury could not so convict without a lesser-included-offense instruction); *United States v. Hunt*, 129 F.3d 739, 745–46 (5th Cir. 1997) (applying *Allison* test and directing entry of judgment on lesser-included offense despite absence of jury instruction); *United States v. Cobb*, 558 F.2d 486, 489 & n.5 (8th Cir. 1977) (remanding for entry of judgment on lesser-included offense when no instruction was given). And in this circuit our most recent opinion on the topic has not expressed such a requirement. *See Smith*, 13 F.3d at 383 (remanding for resentencing on lesser-included offense despite absence of instruction).[4] Nor do we see any reason to require a request for a jury instruction as a

---

[4] Defendants' reliance on *United States v. Mitcheltree*, 940 F.2d 1329 (10th Cir. 1991), is misplaced. The defendant in that case was convicted of introducing a misbranded drug into interstate commerce with intent to mislead or defraud and conspiracy to do the same. *See id.* at 1332–33. The government presented two theories: (1) that the defendant had defrauded a governmental agency and (2) that the defendant had defrauded consumers. *See id.* at 1346. We held that the evidence was sufficient to prove guilt only under the second theory. *See id.* at 1346, 1351. Because we could not determine the theory on which the jury convicted the defendant, we remanded for a new trial. *See id.* at 1352. (We should note that under present doctrine we would have affirmed the conviction, since we assume that the jury did not convict on the theory for which there was insufficient evidence. *See United States v. Ayon Corrales*, 608 F.3d 654, 657 (10th Cir. 2010) ("[W]hen there is sufficient evidence to support a conviction on one theory of guilt on which the jury was properly instructed, we will not reverse the conviction on the ground that there was insufficient evidence

precondition to entering a conviction on a lesser-included offense. In some circumstances the prosecution's failure to request a lesser-included-offense instruction might prejudice the defense in a way that makes it unfair for a court to enter judgment on a lesser-included offense. But the two reasons Defendants give here are not persuasive.

First, Defendants suggest that given the district court's decision that there was insufficient evidence, it is clear that the jury erred in not acquitting defendant, and the prosecution should face the same consequence as if there had been an acquittal by the jury. But one could just as well argue that the district court's postverdict decision shows that the court erred in not detecting the evidentiary insufficiency during trial. And if the district court had detected the evidentiary insufficiency, there is little

---

to convict on an alternative ground on which the jury was instructed.").) In a footnote we explained why we were not proceeding as we had in *United States v. Industrial Laboratories*, 456 F.2d 908 (10th Cir. 1972). *See Mitcheltree*, 940 F.2d at 1352 n.17. In *Industrial Laboratories* we held that the court had incorrectly instructed the jury on the elements of the offense. *See* 456 F.2d at 911. Although standard practice in this situation would have been to remand for retrial, both parties at oral argument had said that if the judgment had to be reversed, they would be content with entry of a judgment on lesser-included offenses not affected by the improper instruction, so we remanded to the district court to enter convictions on the lesser offenses. *See id.* at 911–12. The *Mitcheltree* footnote noted the possibility of entering convictions on lesser-included offenses in that case but declined to do so. We explained "that no lesser included offense instructions were given in this case"; that no party had "made any concessions on this issue"; and that no party had addressed the issue. 940 F.2d at 1352 n.17. Perhaps (we are hardly certain) the panel thought that it could not enter judgment on a lesser-included offense when the jury had not been instructed on the matter; but we do not consider that unelaborated comment to constitute a binding holding when there were other compelling reasons not to enter the same sort of judgment as in *Industrial Laboratories*. For one thing, the government may have wished to pursue a conviction on the greater offense on retrial.

doubt that the court had authority at that point to give a lesser-included-offense instruction. "It is perfectly proper for the court to give a lesser included offense instruction under the necessary elements test at the request of the defendant, the prosecution, or *sua sponte*—whether or not any party objects." *Smith*, 13 F.3d at 383 (brackets and internal quotation marks omitted); *see also United States v. Begay*, 833 F.2d 900, 901 (10th Cir. 1987) ("The trial court instructs the jury in accordance with the evidence and the applicable law whether requested or not. The decision of whether there is enough evidence to justify a lesser included offense charge rests within the sound discretion of the trial judge." (brackets, citation, and internal quotation marks omitted)).[5] Alternatively, the district court might have declined to instruct on the greater offense and instructed only on the lesser-included offense. "[T]he possibility of such an instruction existed throughout the trial," *Smith*, 13 F.3d

---

[5] We note that in civil cases a party could not proceed as Defendants did here—challenging the sufficiency of the evidence for the first time after the jury has been excused (when it is too late to provide new jury instructions or to allow the opposing party to offer additional evidence). *See Mountain Dudes v. Split Rock Holdings, Inc.*, 946 F.3d 1122, 1135 (10th Cir. 2019) ("[T]he district court's post-trial decision to grant Defendants judgment as a matter of law under [Federal] Rule [of Civil Procedure] 50(b) on grounds Defendants never asserted in either their Rule 50(a) or 50(b) motions, was error because it deprived Mountain Dudes of the pre-deliberation notice and opportunity to rectify any deficiency in its evidence that Rule 50 was intended to provide."). To be sure, the rule is otherwise in criminal cases. *See* Fed. R. Crim. P. 29(c)(1) (permitting a motion for judgment of acquittal after guilty verdict or discharge of jury). But we doubt that the moving force behind the criminal rule was a desire to encourage defendants to do what was done (intentionally or inadvertently) in this case: that is, try to preclude a conviction on a lesser-included offense by not challenging the element in the greater offense until it is too late to instruct the jury on the lesser-included offense.

at 383, so Defendants cannot plausibly claim to be blindsided by their convictions on the lesser-included offenses.

Second, Defendants contend that the district court's "sua sponte" decision to enter judgment on lesser-included offenses violated the party-presentation principle. The party-presentation principle, however, restricts courts from *raising* new issues. *See United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020) ("[I]n both civil and criminal cases, in the first instance and on appeal, we rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present." (ellipsis and internal quotation marks omitted)). The principle does not say that once an issue has been raised and responded to, a court must render its decision in accordance with the position of one of the parties. Courts have always had authority to resolve raised issues as fairness requires. If one party says that a contract unambiguously means A and the opposing party says that it unambiguously means B, the court may decide that the contract is ambiguous and that its meaning needs to be decided using extrinsic evidence. If one party challenges the admissibility of evidence and the proffering party provides a ground of admissibility, the court may admit the evidence but give a limiting instruction. Or if opposing parties file cross-motions for summary judgment on the same claims, the court may split the difference by granting in part and denying in part each motion. In this case, Defendants sought acquittal due to the government's failure to prove the proximity element, and the government countered that there was sufficient evidence of that

30

element. The district court in our view fairly resolved the dispute by giving

Defendants some, but not all, of the relief they sought.

We affirm the decision of the district court to enter judgment on the lesser-included offenses.

### C.    Clerical error

Finally, the district court's judgments of conviction misstate the offenses of conviction as the charged, broader offenses (with the proximity element) rather than the lesser-included offenses (without that element). All parties agree that this was simply a clerical error and that the remedy should be remand. We therefore remand to the district court to correct the judgments.

### III.    CONCLUSION

We **AFFIRM** the convictions on the lesser-included offenses. But we **REMAND** for correction of the clerical error in the judgments of conviction.

*United States v. Cortez-Nieto & Cervantes-Aguilar*, Nos. 20-3184, 20-3189

**HOLMES**, J., Concurring.

I feel obliged to write separately for the following reasons. I join all the well-written lead opinion, except for footnote 3. I share many of the concerns that Judge Bacharach raises in his thoughtful separate writing regarding the substance of this footnote, especially the party-presentation concerns (i.e., no party makes the argument found in footnote 3). However, unlike Judge Bacharach, I respectfully decline to engage with footnote 3's Pythagorean theorem analysis; doing so, in my view, only compounds the problem of writing about—and arguably opining on—matters that the parties do not discuss. I think it is sufficient to note my respectful objection to footnote 3 and to decline to join it. I do agree with the limiting discussion of Part II.B of Judge Bacharach's separate writing, and I therefore join it.

*United States of America v. Orlando Cortez-Nieto & Jesus Cervantes-Aguilar*, Nos. 20-3184, 20-3189,
**BACHARACH**, J., concurring in part and dissenting in part.

I agree with the majority that (1) the district court did not err by sua sponte entering convictions on lesser-included offenses, (2) the prosecutor did not commit misconduct, and (3) we must remand for correction of the clerical error in the judgment. But I do not join the lead opinion's discussion questioning the correctness of the district court's entry of an acquittal on the greater offense, and I would find instructional error. That error prevented the jury from considering how the witnesses' own possible guilt might have affected their credibility. Because the error was not harmless beyond a reasonable doubt, I would reverse the district court's judgment and remand for a new trial.

I also write to emphasize the limited scope of our opinion on the sua sponte entry of a conviction on the lesser-included offense. Although the majority upholds this conviction, the reasoning turns on our facts. In another case, where the government might opt for an all-or-nothing strategy, we might reach a different outcome.

## I.   The jury instructions were erroneous.

Instruction 24 directed the jurors not to let the possible guilt of others enter their minds. On its face, this instruction prevented the jury from considering the defendants' argument that the Suarez siblings had

falsely testified to hide their own guilt. At best, the other instructions contradicted this instruction, confusing the jury.

This confusion would require reversal unless the government showed that the error had been harmless beyond a reasonable doubt. The evidence of guilt had been strong, but not overwhelming. So I would reverse and remand for a new trial with a properly instructed jury.

## A.    Our review is de novo.

Because Mr. Cervantes and Mr. Cortez-Nieto objected to the jury instruction, we conduct de novo review for legal error, asking whether the instructions "in the context of the entire trial . . . accurately state[d] the governing law and provide[d] the jury with an accurate understanding of the relevant legal standards and factual issues in the case." *United States v. Jean-Pierre*, 1 F.4th 836, 846 (10th Cir. 2021) (quoting *United States v. Christy*, 916 F.3d 814, 854 (10th Cir. 2019)).

If an instruction were ambiguous, we would ask "whether there is a reasonable likelihood that the jury . . . applied the challenged instruction in a way that prevent[ed] the consideration of constitutionally relevant evidence." *Boyde v. California*, 494 U.S. 370, 380 (1990). A defendant must show more than a possibility (though not necessarily a likelihood) that the jury had been misled. *Id.*

2

**B.    The jury instructions told the jury not to consider a key defense argument on credibility.**

Instruction 24 told the jury:

> You are here to decide whether the government has proved beyond a reasonable doubt that each defendant is guilty of the crimes charged. The defendants are not on trial for any act, conduct, or crime not charged in the Superseding Indictment.
>
> It is not up to you to decide whether anyone who is not on trial in this case should be prosecuted for the crime charged. The fact that another person also may be guilty is no defense to a criminal charge.
>
> *The question of the possible guilt of others should not enter your thinking as you decide whether these defendants have been proved guilty of the crimes charged.*

R. vol. 1, at 343 (emphasis added). The italicized sentence could have misled the jury to think that it couldn't consider the Suarezes' possible motives to lie.

The starting point is the instruction's text. The challenged language was broad, prohibiting the jury from even "thinking" about "the question of the possible guilt of others." *Id.* Standing alone, this language could easily mislead the jury. On its face, the language prohibited consideration of the possible guilt of others. This broad prohibition doomed the defense's argument that the Suarez siblings had lied to conceal their own guilt.

The government counters that this instruction didn't "facially purport to address matters of witness credibility." Appellee's Resp. Br. at 18. But

3

the instruction prohibited the jury from "thinking" about the Suarez siblings' possible guilt. R. vol. 1, at 343. That prohibition would necessarily prevent consideration of the siblings' possible guilt when assessing their credibility. So the jury was reasonably likely to read the challenged instruction to prohibit the defendants' argument on credibility.

### C.　The context created a contradiction rather than clarity.

The government argues that the context resolves any possible problems with the instruction because

- the rest of Instruction 24 clarified the challenged language and

- other instructions allowed the jury to consider the Suarez siblings' credibility.

But even with this context, the instructions were reasonably likely to mislead the jury.

*The Rest of Instruction 24*

The rest of Instruction 24 does not resolve the issues with the challenged language.

The government argues that the challenged instruction is best read to merely restate the prior two sentences, which told the jury:

> It is not up to you to decide whether anyone who is not on trial in this case should be prosecuted for the crime charged. The fact that another person may also be guilty is no defense to a criminal charge.

*Id.* For two reasons, the jury was unlikely to read the instruction that way.

4

First, those two sentences appeared a paragraph away from the challenged sentence. The separation could lead a juror to infer that the last paragraph conveyed a separate idea.

The separation of ideas appeared implicit in the structure of the instruction, which consisted of three paragraphs. The first two paragraphs conveyed two separate ideas:

- Paragraph 1: The jury should not consider whether the defendants committed any crimes not charged in the indictment.

- Paragraph 2: The jury should not acquit the defendants merely because somebody else also committed the crime.

*Id.* So the jury was reasonably likely to assume that the third paragraph would convey a separate idea—rather than restate the previous paragraph.

Second, the jury could reasonably infer that the court would not needlessly repeat instructions. We apply a similar inference when interpreting statutes and contracts. *Navajo Nation v. Dalley*, 896 F.3d 1196, 1215 (10th Cir. 2018); 11 *Williston on Contracts* § 32:5 (4th ed.). This inference is not absolute, but it is a common default rule in both legal and non-legal writing. Antonin Scalia & Bryan A. Garner, *Reading Law* 174 (2012). The jury was thus reasonably likely to interpret the challenged sentence as something different than the prior sentences.

*Instructions on Witness Credibility*

The government also urges clarification from Instructions 4 and 6, stating that they told the jury to consider the possibility of a reason to lie.

5

Instruction 4 told the jury to consider whether a witness had any reason to lie or any personal interest in the case. R. vol. 1, at 318. Instruction 6 told the jury to

- use particular caution when considering informant testimony and

- consider whether an informant had an agreement with the government, an interest in the outcome of the case, or prejudice against the defendant.

*Id.* at 321.

But neither instruction discussed a witness's possible guilt. Both instructions just implicitly authorized the jury to consider whether the Suarez siblings' potential guilt had created a motive to lie. So the jury was left with conflicting instructions: Instruction 24 implicitly barred consideration of the siblings' potential guilt, and Instructions 4 and 6 implicitly allowed such consideration.

We cannot assume that the jury would have correctly resolved this conflict. "Language that merely contradicts and does not explain a constitutionally infirm instruction will not suffice to absolve the infirmity. A reviewing court has no way of knowing which of the two irreconcilable instructions the jurors applied in reaching their verdict." *Francis v. Franklin*, 471 U.S. 307, 322 (1985).

The uncertainty is particularly significant here because

- the instructions did not indicate that one was more important than another and

6

- the correct instruction was "given earlier and separately from" the erroneous instruction.

*Baer v. Neal*, 879 F.3d 769, 780 (7th Cir. 2018). We thus can't possibly know whether the jurors followed

- Instruction 24's prohibition on considering the Suarez siblings' possible guilt or

- the directives in Instructions 4 and 6 to consider witnesses' motives to falsely testify.

The government also relies on our cases presuming that jurors follow the court's instructions. But that presumption doesn't tell us what the jury does when the instructions contradict each other.

**D.    Our previous opinions haven't addressed this situation.**

The government relies on three of our prior opinions. But those opinions involved either a different instruction or a different defense argument.

The first case, *United States v. Oberle*, involved a different argument. 136 F.3d 1414 (10th Cir. 1998). There the defendant was charged with robbing banks. *Id.* at 1417. The defendant argued that (1) there was only one robber and (2) his brother was the culprit. *Id.* So if the jury believed that if the brother had robbed the banks, the defendant couldn't have committed the crime.

Given the defendant's argument, we addressed only an instruction to disregard the guilt of others. We concluded that this instruction hadn't

7

prevented the consideration of the defendant's innocence. *Id.* at 1422–23. We didn't discuss how such an instruction would affect an evaluation of credibility.

The second case, *United States v. Arras*, involved an argument resembling the one here. But that case involved different instructional language. 373 F.3d 1071 (10th Cir. 2004). In *Arras*, the trial court instructed the jury:

> You are here to decide whether the government has proven beyond a reasonable doubt that each defendant is guilty of the crimes charged. And you must not be concerned with the guilt or innocence of other persons not on trial as a defendant in this case.

*Id.* at 1076. That instruction resembled the second paragraph of Instruction 24—which the defendants do not challenge.[1] We did not consider the validity of an instruction categorically barring consideration of the possible guilt of others, like the third paragraph of our instruction.

In the third case, *United States v. Little*, the trial court gave the same instruction as the one given here. 829 F.3d 1177, 1186 (10th Cir. 2016). But the defendant in *Little* argued that this instruction had prevented the

---

[1]     The second paragraph of Instruction 24 told the jury

> It is not up to you to decide whether anyone who is not on trial in this case should be prosecuted for the crime charged. The fact that another person also may be guilty is no defense to a criminal charge.

R. vol. 1, at 343.

8

jury from considering the possibility that somebody else committed the crime. *Id.* The defendant in *Little* did not question the impact of the jury instruction on credibility. So the panel applied our precedent to foreclose this challenge. *Id. Little* thus provides no meaningful guidance.

* * *

Our review of the alleged instructional error is fact-dependent. We consider the instructions in the context of the full record, including the other instructions and the nature of the defendant's argument. *United States v. Jean-Pierre*, 1 F.4th 836, 846 (10th Cir. 2021). So we can draw little help from the three cited cases; all of them involve instructions or arguments differing from ours.

### E.    The government has not shown the error was harmless beyond a reasonable doubt.

The parties agree that if the jury instructions were erroneous, the error would have violated the defendants' Sixth Amendment right to confront prosecution witnesses. Because the jury instructions were erroneous, we must reverse unless the government proved that the error had been harmless beyond a reasonable doubt. *United States v. Holly*, 488 F.3d 1298, 1307 (10th Cir. 2007). In other words, we can affirm only if the government proved "beyond a reasonable doubt that the error complained of [had not] contribute[d] to the verdict obtained." *Id.* (quoting *Neder v. United States*, 527 U.S. 1, 15 (1999)).

9

The government argues that any error was harmless beyond a reasonable doubt because

- the challenged instruction was unlikely to affect the jury's evaluation of the Suarezes' credibility and

- the evidence of guilt was overwhelming.

I disagree.

*Effect on Credibility Determinations.* The government presents two reasons to discount possible influence on the jury's assessment of credibility: (1) other instructions allowed the jury to consider whether the Suarez siblings had falsely testified to hide their own guilt and (2) other information gave the jury reason to doubt the siblings' credibility. Both reasons are questionable.

The first reason (the other instructions) shows only that the jury faced a conundrum. On the one hand, the instructions told the jury that it could consider the siblings' reasons to lie. On the other hand, the instructions stated that the jury couldn't consider the siblings' guilt. This conflict would create confusion rather than clarity.

The second reason (other information about the siblings' credibility) didn't diminish the impact of the error. The government's briefing cited other reasons to doubt Victor's testimony, but few other reasons to doubt Celia's testimony. So the jury may have credited Victor's testimony because Celia had corroborated it. We cannot be confident that a correctly

10

instructed jury would make the same decision about the siblings' credibility.

*Evidence of Guilt.* We can consider the evidence when deciding whether an error was harmless beyond a reasonable doubt. But we cannot "become in effect a second jury to determine whether the defendant is guilty." *Neder v. United States*, 527 U.S. 1, 19 (1999) (quoting Roger J. Traynor, *The Riddle of Harmless Error* 21 (1970)). When the jury has been erroneously instructed, the error is not harmless if the evidence would allow the jury to acquit. *See id.* (error would not be harmless when "the defendant contested the omitted element and raised evidence sufficient to support a contrary finding").

The evidence of guilt was strong but not overwhelming. The government presented extensive evidence that

- the defendants had bought items used to process methamphetamine, including large quantities of acetone, and

- those items had appeared in the Cleveland Avenue house.

But the defendants conceded that they had bought these items. The government needed to prove not only the purchases but also the defendants' intended use of the items for an illegal purpose.

The government tried to prove intent based on the defendants' presence in the Cleveland Avenue house. The government theorized that if the defendants had been inside the house while the lab was in operation,

11

they would have seen the methamphetamine. To advance this theory, the government presented evidence that the defendants had used the address of the house. For example, in the kitchen was a package addressed to Mr. Cortez-Nieto at the house's address. Elsewhere in the house was a money order listing Mr. Cervantes as the sender and his address as the Cleveland Avenue house. And somebody had registered a car, giving the Cleveland Avenue address as the address for Mr. Cervantes. But none of this evidence actually placed the defendants inside the house—they could have simply used the house to receive mail or to show a local residence. The jury needed to infer that the defendants had actually entered the house.

The landlord testified that he had seen Mr. Cervantes enter the house; but before trial, the landlord hadn't been able to pick out Mr. Cervantes from a photo. So the jury might have discredited the landlord's testimony.

The government also showed the jury (1) photographs of a camouflage coat inside the house and (2) surveillance footage of Mr. Cortez-Nieto wearing a similar coat. But the investigators did not seize the coat or determine whether it was Mr. Cortez-Nieto's size. So the jury may have concluded that the government hadn't proven that it was the same coat.

Finally, the government presented evidence that the defendants' cell phones had pinged towers near the Cleveland Avenue house. But a defense expert testified that the same towers had also served a different house

12

where both defendants lived at about the same time. So a reasonable jury could conclude that the cell tower data hadn't shown the defendants' presence in the Cleveland Avenue house.

The jury could also have doubted guilt based on gaps in the government's proof. For example, the government had no DNA from any of the evidence at the Cleveland Avenue house. Nor was there any evidence of criminal acts even though the government had monitored both defendants for four to five months. So a jury could legitimately question the defendants' involvement in drug distribution.

The government countered with the Suarez siblings' testimony to close these gaps and place the defendants at the house. The siblings testified that Mr. Cervantes had headed the methamphetamine lab in the Cleveland Avenue house and had obtained help from Mr. Cortez-Nieto. A reasonable jury could have viewed this testimony as direct evidence of the defendants' guilt. The Suarez siblings' testimony, if credited, would significantly boost the government's case by removing any inferential gaps.

In considering harmless error, we must ask whether the government proved beyond a reasonable doubt that the error hadn't affected the verdict. *See* p. 9, above. Here the government presented strong circumstantial evidence of guilt, which could have allowed the jury to find guilt even with proper instructions. But gaps existed between the circumstantial

13

evidence and the necessary mens rea, and a reasonable jury could conclude that the Suarez siblings had closed those gaps. The instructions thus improperly narrowed consideration of the siblings' credibility.

## II.    I would also affirm the district court's entry of a conviction on a lesser-included offense.

I agree with most of the majority's analysis of the district court's decision to enter convictions for lesser-included offenses. But I write separately for two reasons:

1.    I disagree with the lead opinion's criticism of the district court's entry of acquittal.

2.    Although we affirm the district court's entry of conviction on a lesser-included offense, our reasoning turns on the facts.

### A.    I respectfully disagree with footnote 3 of the lead opinion.

The government did not cross-appeal the district court's grant of a motion of acquittal, so we cannot reverse that decision and no one briefed it. *See Johnson v. Spencer*, 950 F.3d 680, 722–23 (10th Cir. 2020). But the lead opinion analyzes the district court's reasoning anyway, suggesting that the government could have successfully defended the conviction on the greater offense. In doing so, the lead opinion

- presents an argument that nobody made here or in district court and

- makes significant assumptions and inferences from the record.

*See* Lead Op. at 22 n.3. So I decline to join footnote 3.

14

In footnote 3, the lead opinion describes a triangle formed by three points: (1) the lab, (2) the end of the driveway, and (3) the park. The end of the driveway was 932 feet from the park. So for guilt on the greater charge, the line from the lab to the park had to be shorter than 1000 feet.[2] But the record does not show (1) the distance from the end of the driveway to the lab (marked $x$ below) or (2) the angle between that line and the line from the driveway to the park (marked $\theta$ below):



If the angle were 90°, the lead opinion might be right. The three points would form a right triangle, with one leg (from the end of the driveway to the park) that is 932 feet long and a hypotenuse (the line from the lab to the park) that had to be less than 1000 feet long. And the Pythagorean theorem tells us that the remaining leg of the triangle would be roughly 362 feet long if the hypotenuse were 1000 feet long ($\sqrt{1000^2 - 932^2}$ is roughly 362). So the majority reasons that

---

[2]    As the district court concluded, "the distance is properly measured from the [playground] to the location *within* the building where the drug-related activity occurred." R. vol. 1, at 398 (citing *United States v. Soler*, 275 F.3d 146, 155 n.6 (1st Cir. 2002) and *United States v. Johnson*, 46 F.3d 1166, 1169–70 (D.C. Cir. 1995)) (emphasis in original).

- the lab would have been within 1000 feet of the park if the lab had been within 362 feet of the end of the driveway and

- the jury could have used common sense to conclude that the lab would have been within 362 feet of the end of the driveway.



But assumptions matter in geometry. For example, the Pythagorean theorem works only for right triangles. Jay Abramson, *Algebra and Trigonometry* 145 (2d ed. 2021), available at https://openstax.org/details/books/algebra-and-trigonometry-2e. So the analysis would change if the angle were between 90° and 180°. In that case, the distance from the lab to the park could exceed 1000 feet with a shorter distance from the lab to the end of the driveway.

Footnote 3 of the lead opinion would resolve this issue by extending the measured leg 40 feet, assuming that the lab couldn't have been more than 40 feet from the street because the house looks "small" from photographs. With this extended leg, the lead opinion reasons that if the

16

lab were within 234 feet of the street, the lab would have been within 1000 feet of the park. ($\sqrt{1000^2 - (932 + 40)^2}$ is between 234 and 235.)



But "[d]istances are notoriously difficult to gauge in still photographs." *United States v. Soler*, 275 F.3d 146, 155 (1st Cir. 2002); *see also United States v. Baylor*, 97 F.3d 542, 546 (D.C. Cir. 1996) ("Spatial relationships are hardly intuitive, and photographs can distort distances."). What if the lab were 65 feet into the property? The lab would then need to be only 78 feet from the street to fall outside the 1000-foot limit. ($\sqrt{1000^2 - (932 + 65)^2}$ is between 77 and 78.) If the lab were 67 feet from the eastern property line, the lab would need to be only 45 feet from the street to exceed 1000 feet from the park. And if the lab were 68 feet from the eastern property line, the lab would always be more than 1000 feet from the park. Without any evidence or argument, we cannot assume that we know the layout of the house, the driveway, and the park better than the parties or the district court.

Given the importance of using the correct inputs, other courts allow the use of the Pythagorean theorem "only where there existed reliable

17

evidence of a right angle and the measurements of the two shorter sides of the triangle were sufficiently reliable and precise, based on admitted evidence." *State v. Wisowaty*, 200 Vt. 24, 31 (2015) (collecting cases). So, for example, the Pythagorean formula could not be used

- "to support a rational inference" that a defendant had violated a restraining order when the length of one side of the triangle entailed an estimate based on an officer's examination of the scene, *State v. Miller*, 289 Or. App. 353, 358–59 (2017), or

- to show that a weapon had been out of reach when two officers estimated distances inside a car, *People v. Harre*, 155 Ill. 2d 392, 397 (1993).

Both cases involved estimates based on personal observation of the scene, but footnote 3 asks us to estimate the lengths of both legs of the triangle based solely on photographs suggesting that the house looks "small."

Estimating the lengths of these legs is precarious and unnecessary, for neither party has suggested that the jury could have relied on the Pythagorean theorem. In my view, we should not address the issue sua sponte. Second-guessing the district court on grounds that the parties have not discussed is unfair to the parties, who get no chance to respond to our new mathematical theories.

I would instead leave the selection and crafting of arguments to the parties. The government is free to argue the Pythagorean theorem the next time this issue arises. If the government does so, the parties can explain and defend their assumptions. But we stray beyond our role when we

18

search through the record and make significant assumptions to justify an argument that nobody has made on an issue beyond our authority to resolve. *See United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020) (explaining that courts, as "passive instruments of government," must "wait for cases to come to them, and . . . normally decide only questions presented by the parties" (cleaned up)). So I do not join footnote 3 of the lead opinion.

> **B.** **The majority's opinion does not address the outcome where the government consciously pursues an all-or-nothing strategy.**

I also write to emphasize the narrowness of the majority conclusion. The majority concludes that the district court properly applied the *Allison* factors, which govern when entry of conviction on a lesser-included offense is appropriate. Lead Op. at 24–26. This conclusion stems from our unusual facts: The defendants waited until after the finding of guilt to argue that the lab was more than 1000 feet from the park. *Id.* at 20–21. Until then, the parties hadn't contested the distance from the lab to the park.

A different outcome might be appropriate when a defendant contests an element and obtains an instruction only on the greater offense. In that case, the district court would need to carefully determine whether the defendant had suffered "undue prejudice" from the failure to instruct on

19

the lesser offense. *United States v. Smith*, 13 F.3d 380, 383 (10th Cir. 1993).

If the government knows that an element is contested but does not seek instruction on the lesser offense, the government could obtain a strategic benefit by presenting the jury with an all-or-nothing choice. When the jury is not instructed on a lesser-included offense, there is a danger that the jury will unjustly convict a defendant on the greater offense: "Where one of the elements of the offense charged remains in doubt, but the defendant is plainly guilty of *some* offense, the jury is likely to resolve its doubts in favor of conviction." *Keeble v. United States*, 412 U.S. 205, 212–13 (1973) (emphasis in original).

But an all-or-nothing strategy carries risks for the government. The jury might acquit, or the judge might grant a post-verdict motion to acquit. Entering a conviction on a lesser-included offense after the verdict would eliminate the second risk, creating a strategic advantage for the government to pursue an all-or-nothing strategy. That strategic benefit could unfairly prejudice the defendant.

But there's no unfair prejudice here. The defendants waited until after the trial to contest the distance from the lab to the park. So the entry of a conviction on a lesser-included offense doesn't reward the government for pursuing an all-or-nothing strategy.

20

### III.    Conclusion

I respectfully dissent from Part II(A) of the majority opinion because I would find instructional error and remand for a new trial. But I agree with most of the majority's analysis of the lesser-included offense and agree that the district court must correct its clerical error. So I join

- Part II(B) of the lead opinion (except for footnote 3) and

- Part II(C).